D. Maimon Kirschenbaum
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, NY 10004
(212) 688-5640
(212) 688-2548 (fax)

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------x

**MARYSSA SMITH,**

        **Plaintiff,**

        **v.**

**DOONEY & BOURKE, PHIL KINSLEY,**
**PETER DOONEY and RICO TREVINO,**


        **Defendant,**
-----------------------------------------------------x

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Maryssa Smith alleges as follows:

## INTRODUCTION

1.    Plaintiff Maryssa Smith, an African-American woman, worked for Defendant Dooney & Bourke for over 17 years.

2.    Defendant Dooney & Bourke egregiously discriminated against Plaintiff on the basis of her race. Specifically, she earned a fraction of what her white counterparts earned; she was never formally given the title of Planner, despite the fact that she was doing exactly what other Planners were doing; and she was the only Planner chosen for termination when Defendants reduced their work force in 2022.

3.    She started in retail stores and then moved to the corporate side of the retail, outlet and online business. Everything she touched, turned to gold. Plaintiff's intiatives increased revenue

in retail and outlet stores, but her ideas for the e-commerce business caused a literal explosion of business.

4.     Regardless of the many millions of dollars Plaintiff generated for her employer, Plaintiff Smith was always treated and paid as an entry-level employee. While Plaintiff's white counterparts received higher salaries and access to leadership, Plaintiff was forced to clock in like an hourly employee, perform manual labor in warehouses and was stripped of her management authority every time one of her ideas took off.

5.     When Plaintiff's initiatives became widely known as the primary drivers of sales growth year over year, Dooney & Bourke handed the now institutionalized initiatives to higher-paid, lower performing white employees.

6.     Even after Plaintiff grew Defendant's business by hundreds of millions of dollars, Dooney & Bourke owner Peter Dooney still would not allow Plaintiff in meetings with him, and Plaintiff's direct supervisor regularly excluded her from meetings held with her white counterparts.

7.     Ultimately, Defendant Dooney & Bourke terminated Plaintiff in a group meeting after 17 years of positive performance.

## JURISDICTION AND VENUE

8.     Plaintiff Maryssa Smith brings this action against Defendants Dooney & Bourke, Peter Dooney, Phil Kinsley, and Rico Trevino alleging discrimination claims brought under 42 U.S. Code § 1981 ("Section 1981"), the Federal Equal Pay Act (the "EPA"), the New York Equal Pay Act, NYLL § 194 ("NY EPA"), and the New York State Human Rights Law, New York Administrative Code §§ 8-107(1), et al.

9.     This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under Section 1981. This Court has supplemental jurisdiction over the

2

New York state law claims, as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10.     Venue is proper in this District because Defendants conduct business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## THE PARTIES

11.     Defendant Dooney & Bourke ("Defendant DB" or the "Company") is a fashion company founded in Connecticut by Peter Dooney and Frederic Bourke. The Company specializes in leather handbags and small accessories. The Company's corporate office is headquartered in Connecticut.

12.     Defendant Peter Dooney ("Defendant Dooney") is a Connecticut resident and the founder, owner and operator of Defendant DB. He controls the day-to-day business of the Company. For example, Defendant Dooney approves product pricing, margins and designs, and he makes many other important decisions that that directly related to Plaintiff's work. In addition, Defendant Dooney has ultimate authority with respect to hiring and firing of employees. In fact, he hired the specific employees who managed Plaintiff's employment, including Defendant Rico Trevino and Peter Beaugard, the Company's Senior Vice President, Chief Operating Officer and Chief Marketing Officer. In addition, Defendant Dooney has ultimate authority over employee compensation and all business decisions.

13.     Defendant Phil Kinsley ("Defendant Kinsley") is the Vice President of Finance for Defendant DB. Defendant Kinsley is a Connecticut resident. Defendant Kinsely had direct authority over Plaintiff's employment. For example, he made decisions regarding Plaintiff's

compensation; and he directed Plaintiff to begin working as a Planner at Defendant's Norwalk location, when she had previously been an assistant store manager in Westchester. Defendant Kinsley is in charge of employee compensation generally and Plaintiff's compensation specifically. Defendant Kinsley also made decisions with respect to hiring and firing of employees and personally communicated Plaintiff's termination to Plaintiff.

14.     Defendant Rico Trevino ("Defendant Trevino") is the Executive Vice President for Defendant DB. Defendant Trevino is a New York resident. He makes decisions with respect to the hiring and firing of employees, employees' titles and the assignment of responsibility to each employee reporting to him. Defendant Trevino had specific authority with respect to hiring and firing employees in Plaintiff's department. In fact, he hired some of Plaintiff's comparators, namely Emily VanBaalen, Lara Mannix, and Jessica Qualls. Defendant Trevino was Plaintiff's direct supervisor, and managed Plaintiff's day-to-day activities. Any scheduling requests that Plaintiff had were addressed specifically to Defendant Trevino.  He gave Plaintiff specific direction with respect to her tasks, on one occasion threatened her with an adverse employment action such as demotion.

15.     Plaintiff Maryssa Smith ("Plaintiff Smith" or "Plaintiff") is a New York resident who has been employed by Defendant DB since May of 2005. Plaintiff is an African American woman and is 44 years old. Plaintiff has worked from her home in Yonkers, New York since the Company's office closed during Covid-19 in or about March 2020.

## FACTS

### Discrimination Facts

16.     Plaintiff began working for Defendant as an Assistant Store Manager in the Company's Westchester store in May of 2005.

17.     When offered the position, Director of Operations Bridget Nelis onboarded Plaintiff and oriented her into her new role.

18.     Among the many things Ms. Nelis shared with Plaintiff in that process was an instruction not to speak to owner Peter Dooney unless and until he spoke to her first. Ms. Nelis told Plaintiff that if he came to the store, she could greet him at the entrance, but nothing more.

19.     Plaintiff found that instruction odd, but later came to see that in fact, Defendant Dooney did not want people like her – namely people of color – speaking with him, while he regularly and freely interacted with white employees.

20.     For example, Defendant Dooney came to the store on one occasion and wanted certain things rearranged in the store. Rather than speak directly to Plaintiff, who was physically present and managing the store, Defendant Dooney called Ms. Nelis, a white woman, and told her to instruct Plaintiff to make the changes.

21.     When Plaintiff did as instructed, Defendant Dooney repeated the humiliating process again, when he decided that he wanted different items on the various displays.

22.     By contrast, Defendant Dooney did speak freely and directly to a white female employee who reported to Plaintiff at the Westchester store.

23.     Even when Plaintiff moved from the retail store to the Company's corporate office, she was never permitted to attend a meeting with Defendant Dooney. Defendant Dooney came to the corporate office three to four days a week and interacted with leadership and Plaintiff's white counterparts, including Planner Lara Mannix and Product Developer Andrea Mathewson. He never interacted with Plaintiff during her 17 years of employment.

24.     Defendant Dooney is actively involved in the day-to-day decision-making within the Company. He selects the styles of all products sold by the Company, makes decisions regarding

product pricing, and makes important business decisions concerning the hiring and firing of personnel.

25.     For example, when Plaintiff worked in the Company's retail store in Norwalk, she was instructed by Ms. Nelis to hire only tall statuesque women or petite women to work in the store because those were the types of people Defendant Dooney preferred to employ. Upon information and belief, Defendant Dooney also made decisions concerning the hiring and firing of employees in the Company's corporate office and was involved in the decision to terminate Plaintiff's employment.

26.     In or about 2007, while Plaintiff was running the Westchester store as the highest ranking manager there, she also began assisting with many areas of the corporate business. She worked with product development to design a new DB branded watch. She helped the Company implement uniform visual merchandising directives throughout all of its retail stores. She helped draft rules and user guides for all of the stores' registers, and she helped other Planners analyze sales for each store.

27.     Later in 2007, Plaintiff transferred to the corporate office in Norwalk, Connecticut. Based on her demonstrated knack for product planning, Plaintiff joined Bob Andrus, a white man, as a Planner and Analyst. While Mr. Andrus focused on planning and analysis for the outlet stores, Plaintiff was tasked with the Planner and Analyst tasks connected with the Company's retail stores.

28.     When Plaintiff moved to the Company's corporate office, she asked Defendant Kinsley if she would maintain the commission-based component of her compensation. Defendant Kinsley informed Plaintiff that nobody in the corporate office could earn commissions.

29.     Plaintiff later discovered that Mr. Andrus earned a significant portion of his compensation by way of sales commissions.

30.     At the time, Defendant DB had seven retail stores and approximately 22 outlet stores.

31.     As a Planner for retail, Plaintiff oversaw the lifecycle of each product, made purchases for the retail stores, planned sales events, managed the markdown cadence for products, changed prices in the Company's system so that store registers would accurately reflect price changes. Plaintiff also ordered sourced items that Defendant DB did not manufacture itself, but then branded, such as personal planners, shoes, and cashmere shawls. Plaintiff also planned for the Company's new retail store in Macau, choosing the store's assortment of products, managing markdowns, and converting prices from U.S. dollars to the Macanese currency.

32.     While working as a Planner for retail, Plaintiff pitched the sales event "Surprise It's $99," a highly-successful event and the Company's biggest Christmas event up until that time.

33.     Plaintiff also created incentives for the Company's retail employees to help generate more sales. She created a 12 Days of Christmas sales contest that motivated store employees to sell significantly more products, and led to record-breaking sales.

34.     Based on her success with the retail stores, Plaintiff was then asked to contribute as a Planner for the outlet stores as well. Those duties included choosing products for the outlet stores, managing markdown cadence for outlet products, establishing replenishment models, and planning events.

35.     For the outlets, Plaintiff pitched the "Surprise It's $75" sale and several sample sale events. Each of these initiatives proved highly effective in growing sales for the Company.

36.     In or about 2009, Plaintiff was asked to help the Company's e-commerce team plan online events.

37.     Plaintiff Smith began contributing to the e-commerce team while still fulfilling all of her tasks for retail and the outlets.

38.     Using the insights she gained from her many successful retail and outlet events, Plaintiff successfully helped the e-commerce team build its online sales activities.

39.     She invented two wildly successful online events that Defendant DB later instituted as annual online events.

40.     Specifically, in 2009 Plaintiff initiated an online event called "12 Days of Dooney," a pre-Christmas event during which the Company discounted different products throughout the 12 days of the event. Each of the 12 days had a theme that determined which online merchandise would be highly discounted. Plaintiff invented the concept, created the 12 themes, chose the products to be discounted, managed the buying and pricing of all items, and then analyzed the success of each day and the event as a whole.

41.     In its first year, "12 Days of Dooney" generated an additional $4 million. In 2021, the last year Plaintiff had partial control over the event, 12 Days of Dooney generated nearly $22 million. Plaintiff brought Defendant DB more revenue with 12 Days of Dooney than the outlet stores generated in an entire year. To date, the event has generated over $151 million for the Company since its inception – 22 percent of the Company's online sales over the past decade.

42.     In or about 2011, Defendant Trevino joined the Company as Executive Vice President. Unfortunately for Plaintiff, despite her great performance, Defendant Trevino did everything to marginalize her and remove her decision-making authority every time one of her sales initiatives became successful and visible to leadership.

43.     When Plaintiff demonstrated highly effective planning skills working for outlets and retail, Defendant Trevino allowed a newly hired white woman, Lara Mannix, to take over Plaintiff's strategic planning duties.

44.     When Plaintiff then garnered enormous success with the e-commerce team, Defendant Trevino handed Plaintiff's strategic decision-making duties to another white woman, Emily VanBaalen.

45.     Upon information and belief, when the Company chose to lay off employees, Defendant Trevino was involved in choosing Plaintiff for termination.

46.     At the time that Defendant Trevino joined Defendant DB, Plaintiff was working simultaneously on retail, outlet and online sales, and her success was undeniable.

47.     Despite Plaintiff's proven abilities, Defendant Trevino began removing tasks from Plaintiff's responsibilities that involved decision-making authority.

48.     In or about 2015, Defendant Trevino hired Lara Mannix, a white woman, as Head of Retail and Outlet Operations as a Planner for retail and outlet stores.

49.     At that time, Plaintiff and Mr. Andrus had been managing all outlet store operations. When Ms. Mannix arrived, Defendant Trevino allowed her to take from Plaintiff all outlet-related tasks involving decision-making authority. Despite Plaintiff's documented history of highly successful Planner work with the outlets, she was forced to do only the most menial and tedious data-entry tasks with respect to outlets once Ms. Mannix joined the Company.

50.     Ms. Mannix immediately began excluding Plaintiff from outlet team emails, while at the same time micro-managing Plaintiff's work on tasks she had performed independently for years. Although Ms. Mannix was not Plaintiff's supervisor, she was permitted to remove and assign responsibilities to Plaintiff, and treat her as a subordinate.

51.     Under Ms. Mannix's management every one of Defendant DB's retail stores closed.

52.     While being shut out of outlet work, Plaintiff's efforts on e-commerce proved highly successful.

53.     Plaintiff increased the number of online sales events on the Company's website and for external websites such as Brad's Deals.

54.     Plaintiff not only planned these events, but she also selected the assortment of products for the sales, managed the markdown structure of items, and maintained forecast changes for off-price items. She was particularly involved in managing the entire scope of the 12 Days of Dooney event.

55.     In or about 2016, Plaintiff conceived the "Summer Fun" online promotional event. This event also spanned 12 or more days, and discounted different items each day in connection with the daily theme.

56.     In its first year in 2016, Summer Fun generated approximately $2.6 million in sales. By 2021, the last year Plaintiff controlled planning for and management of the event, Summer Fun generated over $7 million. In 2022, when Planner Emily VanBaalen, a white woman, fully took over management of Summer Fun, the event brought in just $4.7 million dollars – a 36% decline since the previous year.

57.     The Company had initially utilized sales events to off-load older merchandise. However, with the growing success of Plaintiff's online sales events, Defendant DB began utilizing sales events as a primary strategy for growing the business. Ultimately, the Company began producing items specifically for sales events.

58.     By 2020 when the Covid-19 pandemic emerged, the bulk of Plaintiff's time was focused on managing e-commerce events.

59.     As a result of the pandemic, Defendant DB temporarily closed all of its outlet stores and sales to department stores, which had also closed during the pandemic, completely dried up. The foundation of business Plaintiff built for Defendant DB's e-commerce business became the Company's beacon.

60.     On or about March 14, 2020, all of Defendant's corporate employees were told to work exclusively from home.

61.     While Plaintiff's white colleagues and fellow Planners received Company computers to continue their work from home, Plaintiff was told that the Company was out of computers and was forced to use her own equipment.

62.     Plaintiff was also told to provide Defendant Trevino with a weekly task list during the work-from-home period. Upon information and belief, her fellow white Planners were not required to provide this weekly log of their work.

63.     As a result of the popularity and success of Plaintiff's online events, Defendant DB began introducing sales events online nearly every day. The Company continues this practice to this day. By comparison, when Plaintiff first started in the corporate office, the e-commerce team had only a Mother's Day sale and a Christmas promotion each year.

64.     In or about January of 2021, Mr. Andrus left the Company. Ms. Mannix, with Defendant Trevino's permission, attempted to unload Mr. Andrus' most menial tasks onto Plaintiff, knowing that Plaintiff was already at maximum capacity in terms of responsibilities.

65.     Ms. Mannix turned to Plaintiff to handle the "grunt" work of data entry, despite the fact that there were several white employees that were less busy than Plaintiff and fully trained to carry out these menial tasks. Prior to his departure, Mr. Andrus had trained Ms. Mannix, Ms. Nelis and a white woman named Alaina Cardillo to carry out these responsibilities.

66.     Mr. Andrus had trained the other members of the outlet team – Ms. Mannix, Ms. Nelis and Alaina Cordello, on how to use KWI, the data platform used to manage pricing, inventory, sales and orders for the stores. The team of white women also received extensive training with Defendant DB's designated KWI representative.

67.     Plaintiff's e-commerce duties already more than filled her work days. The exponential increase in the number of online sales events in 2020 also caused a sharp increase in Plaintiff's responsibilities. She had more markdowns and forecast codes to manage, more sales reports to create in order to understand how to plan accurately for future events. Web promotion also required projections as well as models. Plaintiff worked tirelessly to ensure that the e-commerce team had reliable and consistent data to execute the vast number of promotions that were keeping the Company afloat during the pandemic.

68.     In the midst of Plaintiff's mounting e-commerce responsibilities, the addition of Mr. Andrus' most time-consuming tasks would have put her beyond capacity. Further, Plaintiff was not offered any additional compensation for taking on the many responsibilities being dumped on her. Ms. Manix, who had systematically excluded Plaintiff from outlet work, suddenly wanted Plaintiff to take on the grunt work. Plaintiff had not even been included in the transition and training meetings with the outlet team when Mr. Andrus left.

69.     Sensing that Defendant DB was taking advantage of her strong work ethic, Plaintiff asked Defendant Trevino and Defendant Kinsley, Vice President of Finance, to clarify her role and responsibilities.

70.     Defendant Trevino responded by threatening Plaintiff that he would define her responsibilities, but that if she questioned any of them, he would "redefine" her role with the Company – a barely-veiled threat to demote or terminate her.

71.     Ultimately, Defendant Trevino agreed to keep Mr. Andrus's outlet tasks with the team that had taken over all outlet functions. However, Defendant Trevino then systematically began reducing Plaintiff's authority over all of the projects she had been successfully managing.

72.     For example, Defendant Trevino directed Emily VanBaalen, a white woman, to work with Plaintiff on the 12 Days of Dooney event. By 2020, Ms. VanBaalen had usurped nearly half of the strategic decision-making tasks related to the event. By 2021, Ms. VanBaalen had taken over all of the strategic planning tasks and left Plaintiff with the data entry grunt work. In 2021, 12 Days of Dooney had one of its lowest increases in sales since the inception of the event.

73.     At the same time, Defendant Trevino also transitioned management of the Summer Fun event to Ms. VanBaalen. As described above, under her management, sales for the event in 2022 declined by 36% from the prior year's sales.

74.     Throughout 2022, Defendant Trevino made Plaintiff's role increasingly administrative and removed her from all management tasks.

75.     In addition, he began scheduling off-site planning meetings with the other white Planners, but stopped including Plaintiff.

76.     By mid-2022, Plaintiff was totally consumed with the most low-level adminsitrative tasks in connection with the Company's outlets and e-commerce business, and had been practically exorcised from all of her leadership functions.

77.     On August 29, 2022, Plaintiff was asked to come into the corporate office by Defendant Kinsley.

78.     At the office, Defendant Kinsley stated that all seven employees present, including Plaintiff were being terminated as a result of changes in the business as a result of the Covid-19 pandemic.

79.     Four of the employees terminated that day were people of color who were long-time employees of the Company, employed for well over a decade.

80.     Plaintiff's performance with the Company was indisputably better than that of her white counterparts at the time. In addition, she had significantly more tenure than her white counterparts at the time. However, when Defendant DB determined to fire employees, she was selected for the chopping block and not her poorly performing white counterparts.

81.     Whereas Plaintiff grew Defendant DB's online business, Ms. Mannix and Ms. VanBaalen contracted it. Whereas Plaintiff supported the growth of Defendant DB's retail and outlet stores, Ms. Mannix quite literally decimated the Company's retail business.

82.     When Ms. Mannix attempted to join the e-commerce efforts, managing a sale on the website, Zulily, she ended up reserving $2 million worth of stock and selling just over $400 worth of merchandise.

83.     On another occasion, Ms. VanBaalen's failure to understand the Company's basic product forecasting codes, caused her to sell Nordstrom Rack products to TJ Maxx. The "oversight" cost the Company $100,000 in fines for breaching their agreement with Nordstrom Rack.

84.     Still, Defendant DB chose not to terminate these underperforming white employees when it chose to layoff employees in August of 2022.

85.     Plaintiff came to understand that Defendant DB did not like their "dark" employees to be visible. For example, when a highly qualified black woman applied for the position of the Company's television QVC representative, she was denied. Upon information and belief, Defendant Dooney was vocal about not wanting a black woman to represent his Company. A white woman was chosen instead.

86.     Given how hands on he was with respect to personnel decisions, Defendant Dooney was certainly involved in Plaintiff's discriminatory termination.

87.     When Plaintiff's role in the Company became too visible for a "dark" woman, she was systematically pushed to do grunt work – even to the detriment of the Company.

**Equal Pay Facts**

88.     Plaintiff served as a Planner from 2007 until her unlawful termination on August 29, 2022. During Plaintiff's tenure she worked as a Planner in the Company's retail, outlet and e-commerce business sectors. During the same, Mr. Andrus, Ms. Mannix, Ms. VanBaalen and Jessica Qualls, a white woman, also served as Planners in Defendant DB's outlet, retail and online sectors.

89.     Plaintiff's responsibilities with respect to retail and outlet stores and online sales events were:

- Choosing the items to be sold in retail and outlet stores and in online sales events.

- Buying sourced items that the Company did not manufacture to be sold in stores and in online sales events.

- Planning sales events for retail and outlet stores and internal and external online sales.

- Managing the markdown cadence for items sold in stores and in online sales events.

- Changing pricing in the Company's system to reflect the correct price at registers and communicating pricing for online sales events to the e-commerce team.

- Analyzing sales for retail and outlet stores, and online sales events.

- Cross functional communication, ie. communicating to stores and the ecommerce team which items are on promotion and what the discount or new pricing should be.

- Forecast codes, ie. determining which styles would be phased out of stores and online sales.

- Modeling, ie. creating models to plan how frequently each store needed to restock each item and how many of each item should be replenished. In the online realm, Plaintiff's equivalent task was creating a reservation model that determined how much stock must be reserved from external purchasers in order to make sure that the online sales would have sufficient stock.

- Ordering product for events in stores and online based on excess raw material.

- Creating reports on sales for each retail and outlet store on a weekly and monthly basis and creating "books" analyzing sales during the online sales events.

90.     Plaintiff earned between $71,000 and $74,000 for the last three years.

91.     Mr. Andrus' responsibilities with respect to retail and outlet stores were nearly identical to the tasks Plaintiff performed for retail, outlet and e-commerce. His responsibilities included:

- Choosing the items that would be sold in the retail and outlet stores.

- Buying sourced items that the Company did not manufacture to be sold in the retail and outlet stores.

- Planning sales events for retail and outlet stores.

- Managing the markdown cadence for items sold in retail and outlet stores.

- Changing pricing in the Company's system to reflect correct price at registers in retail and outlet stores.

- Analyzing sales for retail and outlet stores.

- Cross functional communication, ie. communicating to the retail and outlet stores which items were on promotion and what the discount or new pricing should be.

- Forecast codes, ie. determining which styles would be phased out of stores.

- Modeling, ie. creating models to plan how frequently each store needed to restock each item and how many of each item should be replenished.

- Creating reports on sales for each retail and outlet store on a weekly and monthly basis

92.     Mr. Andrus, a white man, earned a total of approximately $250,000 for performing the same or substantially similar tasks as Plaintiff in the retail and outlet store sector of Defendant DB's business. Upon information and belief, Mr. Andrus earned a base salary of $89,000 plus a commission of all outlet store sales. Mr. Andrus was guaranteed a minimum overall compensation of $250,000, so if his commissions did not bring his overall annual compensation to $250,000, the Company made up the difference.

93.     Ms. Mannix' responsibilities as a Planner for retail and outlet stores and the Company's discount website, ilovedooney.com ("ILD"), included:

- Choosing the items that would be sold in the stores or on ILD.

- Buying sourced items that the Company did not manufacture to be sold in the outlet stores

- Planning sales events for retail and outlet stores and ILD.

- Managing the markdown cadence for items sold in retail and outlet stores and on ILD.

- Analyzing sales for retail and outlet stores, and ILD.

- Cross functional communication, ie. communicating to the retail and outlet stores and the ecommerce team which items are on promotion and what the discount or new pricing should be in the stores and on ILD.

- Forecast codes, ie. determining which styles would be phased out of stores and ILD sales.

- Modeling, ie. creating models to plan how frequently each retail and outlet store needed to restock each item and how many of each item should be replenished. In the online realm, Ms. Mannix performed the equivalent task of creating a reservation model (as described above) for ILD sales.

- Ordering product for events in outlet stores or on ILD based on excess raw material.

94.     Upon information and belief, Ms. Mannix, a white woman, earned approximately $250,000 for performing the same tasks as Plaintiff for the retail, outlet and discount online business for the Company.

95.     Ms. VanBaalen's responsibilities as a Planner for the Company's online business, included:

- Choosing the items that would be sold in online sales.

- Planning sales events for external online sales such as Brad's Deals.

- Managing the markdown cadence for items sold in online sales events.

- Communicating to the e-commerce team changing pricing for online sales.

- Analyzing sales for online sales events.

- Cross functional communication, ie. communicating to the e-commerce team which items are on promotion and what the discount or new pricing should be.

- Setting forecast codes, ie. determining which styles would be phased out of online sales.

- Creating a reservation model, ie. determining how much stock must be reserved from external purchasers in order to make sure that the online sales will have sufficient stock.

- Ordering product for sales events online based on excess raw material.

- Creating reports certain online sales such as "deals of the day."

96.     Upon information and belief, Ms. VanBaalen, a white woman, earned significantly more than Plaintiff while performing the same tasks as Plaintiff for the Company's online business.

97.     Ms. Qualls' responsibilities with respect to full-price online sales were nearly identical to Plaintiff's duties and included:

- Choosing the full-price items that would be sold online.

- Buying sourced items, specifically Alto bags, that the Company did not manufacture itself to be sold online.

- Managing the markdown cadence for Altobags sold online.

- Analyzing sales data for online sales.

- Cross functional communication, ie. communicating to the ecommerce team item prices.

- Forecast codes, ie. determining which styles would be phased out of full-price online sales.

- Reservation modeling, ie. creating models to plan which inventory to protect from external buyers so that the Company had sufficient stock for full-price online sales.

- Ordering product for online sales based on excess raw material.

- Creating merchandise turnover reports.

98.     Upon information and belief, Ms. Qualls, a white woman, earned significantly more than Plaintiff while performing the same tasks as Plaintiff.

99.     In 2019, Plaintiff's 12 Days of Dooney and Summer Fun events alone brought in approximately $27 million. That same year, the outlet stores brought in just under $23 million over the entire year. Plaintiff did not receive any commission for this extraordinary work. Instead she made less than one-third of what Mr. Andrus earned. That year, Plaintiff earned $71,578.

100.     Ms. Mannix served as a Planner for the Company's retail and outlet stores. When she arrived, she took over the strategic decision-making functions of Plaintiff's job and left the grunt work to Plaintiff and Mr. Andrus.

101.     As described above, Ms. Mannix's responsibilities mirrored Plaintiff's responsibilities. On her watch as Head of Retail and Outlet planning, all of Defendant DB's retail stores closed as a result of faltering sales performance. Despite the drastic loss of business as a result of her strategic planning, she earned three times Plaintiff's salary.

102.     Ms. Qualls also served as a Planner for Defendant DB. Her role in planning the Company's online full-price sales directly paralleled Plaintiff's role with the Company's online discount sales, as described above.

103.     Ms. VanBaalen initially served as a Planner for the Company's sports collection. When that area of the business shriveled up, Defendant Trevino had Ms. VanBaalen take over strategic management of 12 Days of Dooney and Summer Fun from Plaintiff. After rising sales every year under Plaintiff's direction, sales in Summer Fun sales in 2022 under Ms. VanBaalen's planning dropped 36% from the prior year's sales.

104.     Despite serving the same functions as the white and/or male Planners with whom she worked, Plaintiff was paid significantly less than her white counterparts.

105.     Several times throughout her tenure with Defendant DB, Plaintiff wrote to Defendant Kinsley, describing in detail the value she added to the business in real dollar amounts and asking to have her salary raised at least to the minimum market level for her position. Defendant Kinsley never approved it.

106.     When Plaintiff negotiated her salary in the corporate office, Defendant Kinsley also told her that nobody in the corporate office received commissions. Meanwhile, the Planner that Plaintiff worked with most closely in her early years in the corporate office was making over $100,000 in commissions each year.

**FIRST CLAIM FOR RELIEF**
**(Section 1981 – Racial Discrimination)**
**As to all Defendants**

107.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

108.     In violation of Section 1981, Defendants intentionally and willfully discriminated against Plaintiff on the basis of her  race.

109.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

110.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

111.     As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to lost wages and damages for emotional distress, physical injuries, and medical treatment, punitive damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

### SECOND CLAIM FOR  RELIEF
**New York State Human Rights Law ("NYSHRL") – N.Y. Exec. Law §§ 290 *et seq.***
**Racial Discrimination**
**As to All Defendants**

112.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

113.     In violation of NYSHRL, Defendants intentionally discriminated against Plaintiff on the basis of her race.

114.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

115.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

116.    As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to lost wages and damages for emotional distress, physical injuries, and medical treatment, and such other legal and equitable relief as this Court deems just and proper.

### THIRD CLAIM FOR RELIEF
**(New York State Human Rights Law – N.Y. Exec. Law § 296(6) –
Aiding and Abetting Discrimination)
As to Defendant Kinsley and Defendant Trevino**

117.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

118.    In violation of the NYSHRL, Defendant Kinsley and Defendant Trevino aided and abetted discrimination against Plaintiff on the basis of her race.

119.    As a direct and proximate result of Defendant Kinsley and Defendant Trevino aiding and abetting discrimination against Plaintiff, she has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

120.    As a direct and proximate result of Defendant Kinsley's and Defendant Trevino's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

121.         Defendant Kinsley's and Defendant Trevino's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

122.         As a result of Defendant Kinsley's and Defendant Trevino's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for emotional distress, physical injuries, and medical treatment; punitive damages; attorneys' fees and costs; and such other legal and equitable relief as this Court deems just and proper.

### FOURTH CLAIM FOR RELIEF
**The Equal Pay Act ("EPA"),**
**29 U.S.C. § 206(d)**
**As to all Defendants**

123.         Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

124.         Defendants have discriminated against Plaintiff within the meaning of the EPA, by providing her with lower pay than a similarly situated male colleague on the basis of her gender even though Plaintiff performed similar duties requiring the same skill, effort, and responsibility as her male counterpart.

125.         The differential in pay between employees was not due to seniority, merit, quantity or the quality of production, or a factor other than gender.

126.         Defendants caused, attempted to cause, contributed to or caused the continuation of wage discrimination based on gender, in violation of the EPA.

127.         The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 206(d).

128.         Plaintiff seeks all legal and equitable remedies available for violations of the EPA, including unpaid compensation, liquidated damages, attorneys' fees and costs, pre- and

post-judgment interest, and such other legal and equitable relief as this Court deems just and

proper.

**FIFTH CLAIM FOR RELIEF**
**New York Equal Pay Act ("NY EPA"),**
**N.Y. Lab. Law §§ 194, 198.**
**As to all Defendants**

129.        Plaintiff realleges and incorporates by reference all preceding paragraphs

as if they were set forth again herein.

130.        Defendants have discriminated against Plaintiff within the meaning of the

New York Equal Pay Act, N.Y. Lab. Law § 194, by providing her with lower pay than similarly

situated white colleagues on the basis of her race even though Plaintiff performed similar duties

requiring the same skill, effort, and responsibility as her white and/or male counterpart(s).

131.        The differential in pay between employees was not due to seniority, merit,

quantity or the quality of production, or a factor other than race or gender.

132.        Defendants caused, attempted to cause, contributed to or caused the

continuation of wage discrimination based on race or gender, in violation of the New York EPA.

133.        The foregoing conduct constitutes a willful violation of the New York

EPA within the meaning of N.Y. Lab. Law 198(1-a).

134.        Plaintiff seeks all legal and equitable remedies available for violations of

the New York EPA, including unpaid compensation, liquidated damages, attorneys' fees and

costs, pre- and post-judgment interest, and such other legal and equitable relief as this Court

deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

25

A.   An award of damages, according to proof, including, back pay, front pay, compensatory damages, emotional distress damages, liquidated damages, and punitive damages, to be paid by Defendants;

B.   Penalties available under applicable laws;

C.   Costs of action incurred herein, including expert fees;

D.   Attorneys' fees;

E.   Pre-judgment and post-judgment interest, as provided by law; and

F.   Such other and further legal and equitable relief as this Court deems necessary, just and proper.

Dated:  New York, New York
        February 23, 2023

Respectfully submitted,

JOSEPH & KIRSCHENBAUM LLP


By: */s/D. Maimon Kirschenbaum*
    D. Maimon Kirschenbaum
    Leah Seliger
    32 Broadway, 5th Floor
    New York, NY 10279
    Tel: (212) 688-5640
    Fax: (212) 688-2548

*Attorneys for Plaintiff*


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which she has a right to jury trial.